# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| **ABE HAMEED JAARI,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:18-cv-0329** |
| | ) | **Judge Aleta A. Trauger** |
| **ANDREW SAUL, Commissioner of** | ) | |
| **Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM

Plaintiff Abe Hameed Jaari filed this action under 42 U.S.C. § 405(g) seeking judicial review of the final decision of the Commissioner of the Social Security Administration (SSA) denying his application for disability insurance benefits (DIB) and supplemental security income (SSI) under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401–434, 1381–1383f. (ECF No. 1.) Now before the court is Jaari's Motion for Judgment on the Administrative Record (ECF No. 17), to which the Commissioner has responded in opposition (ECF No. 19). At issue is whether the finding of the administrative law judge (ALJ) that Jaari was not entitled to DIB or SSI is supported by substantial evidence. [1] (ECF No. 13 at Tr. 16–40.)

Upon consideration of the parties' briefs, the transcript of the administrative record, and for the reasons offered below, Jaari's motion for judgment on the administrative record will be denied and the decision of the SSA will be affirmed.

---

[1] The Administrative Record found at ECF No. 13 is hereinafter referenced by "Tr." All page numbers refer to the Bates stamp at the bottom right corner of each page.

## I.    Introduction

Jaari filed his DIB and SSI applications on August 4, 2014, alleging disability onset as of May 24, 2013, which was one day after the ALJ's decision denying other earlier DIB and SSI applications Jaari had filed. Jaari claimed disability based on "mental, back, neck, knees, arms, diabetes, high blood pressure, and hernia." (Tr. 96–97.) The disability onset date was later amended to July 31, 2014. (Tr. 16, 22, 48.) Jaari's claim to benefits was denied at the initial and reconsideration stages of state agency review. (*Id.*). Jaari requested de novo review by an ALJ. (*Id.*) The ALJ heard the case on October 25, 2016, when Jaari appeared with counsel and gave testimony. (Tr. 16, 50–68, 70–72, 75.) Testimony was also received from Charles E. Wheeler, a vocational expert (VE). (Tr. 16, 68–70, 72–74, 75–76.) At the conclusion of the hearing, the matter was taken under advisement until May 11, 2017, when the ALJ issued a written decision finding that Jaari was not disabled. (Tr. 16–40.)

That decision contains the following enumerated findings:

1.  The claimant meets the insured status requirements of the Social Security Act through December 31, 2014.

2.  The claimant has not engaged in substantial gainful activity since July 31, 2014, the amended alleged onset date (20 CFR 404.1571 et seq., and 416.971 et seq.).

3.  The claimant has the following severe impairments: degenerative disc disease, osteoarthritis, diabetes mellitus, diffuse hepatic steatosis, and carpal tunnel syndrome (20 CFR 404.1520(c) and 416.920(c)).

                    *       *       *

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

                    *       *       *

5.  After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR

404.1567(b) and 416.967(b) except that he can occasionally lift and carry up to 20 pounds and frequently lift and carry no more than up to 10 pounds; stand and/or walk for a total of about four hours in an eight-hour workday; sit for about a total of four hours in an eight-hour workday; would need to alternate between sitting, standing and walking about every 30 minutes; can occasionally stoop and crouch; can frequently balance; can frequently climb stairs and ladders; can frequently kneel and crawl; can push and pull no more than occasionally with the bilateral upper extremities with the same weight limits given for lifting and carrying; can frequently engage in reaching in all directions including overhead; otherwise has no manipulative limitations except that he can no more than frequently perform bilateral handling and feeling; has no environmental limitations and no mental functional limitations.

\*       \*       \*

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

\*       \*       \*

7. The claimant was born on June 30, 1965 and was 49 years old at the amended alleged disability onset date, which is defined as a younger individual age 18-49. The claimant became 50 years old on June 30, 2015, which is defined as closely approaching advanced age (20 CFR 404.1563 and 416.963).

8. The claimant has a high school education with one year of college and is able to communicate in English (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled (20 CFR 404.1568 and 416.968).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

\*       \*       \*

11. The claimant has not been under a disability, as defined in the Social Security Act, from July 31, 2014, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 19–21, 33–35.)

On February 1, 2018, the Appeals Council denied Jaari's request for review of the ALJ's decision (Tr. 1–5), thereby rendering that decision the final decision of the SSA. This civil action

was timely filed, and the court has jurisdiction. 42 U.S.C. § 405(g).

## II.     Prior Claim and Finding

Before filing the applications that are the subject of the instant litigation, Jaari filed applications for DIB and SSI on August 19, 2010. In both previous applications, Jaari alleged a disability onset date of June 1, 2008. Both applications were denied at the initial and reconsideration stages of state agency review. An ALJ heard the case on April 5, 2013. Jaari appeared and testified at the hearing, as did John W. McKinney III, a vocational expert. At the conclusion of the hearing, the matter was taken under advisement until May 23, 2013, when the prior ALJ issued a written decision finding Jaari not disabled. (Tr. 83–95.)

In his written decision, the prior ALJ stated:

After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) with occasional lifting/carrying of up to 20 pounds and frequent lifting/carrying of up to 10 pounds, occasional postural activities, standing a total of 4 hours during an 8- hour workday for 1 hour at a time, walking a total of 4 hours during an 8-hour workday for 30 minutes at a time, sitting for 6 hours during an 8-hour workday for 1 hour at a time, operate foot controls and reach overhead frequently, frequently reach, handle, and finger objects, no working at unprotected heights or in extreme temperatures, occasional exposure to moving parts and vehicles, and no walking on uneven surfaces.

(Tr. 86.)

## III.    Review of the Record

Before reviewing Jaari's medical records, the ALJ briefly set forth the limits of his review, as follows:

"Absent evidence of an improvement in the claimant's condition, a subsequent Administrative Law Judge is bound by the findings of a previous Administrative Law Judge." *Drummond v. Commissioner*, 126 F.3d 837, 842 (6th Cir. 1997); *see also* Social Security Acquiescence Ruling 98-4(6) *Dennard v. Secretary of Health and Human Services*, 907 F.2d 598 (6th Cir. 1990), which imposes similar requirements. Having reviewed the evidence in this claim, I conclude that new and material evidence is not present to suggest any significant change has occurred in the claimant's overall condition. That stated, I do find that the actual residual

functional capacity findings for light work require some change. Important to note, the claimant testified that he remembers his prior hearing and stated that nothing has changed since then, but the medications have changed.

(Tr. 16–17.)

The ALJ summarized Jaari's medical records as follows:

Review of the evidence established that the prior Administrative Law Judge found degenerative disc disease, osteoarthritis, diabetes mellitus, steatohepatitis, post-hernia repair to be severe impairments; and depression to be non-severe. Regarding diagnostic testing, lumbar x-rays showed only "mild" early spondylitic change with no nerve root compression. Electromyogram (EMG) study showed cervical radiculopathy. Regarding hernias, he did require repair of recurrent umbilical and ventral hernias. However, his physician simply indicated that claimant could avoid heavy lifting. Regarding mental problems, he had reportedly experienced depression, saw ghosts and heard voices. He also testified that he could speak English well and could read and write English some. However, he also traveled back and forth to the Middle East repeatedly. For example, he traveled to the Middle East in 2008 and had hernia surgery there. In September 2010, he reported he was going to Saudi Arabia and went abroad for three months, returning in February 2011. In September 2011, he said he would be traveling outside the United States in two weeks and would be away for one to three months. In February 2012, he indicated that he was going to Iraq. In March 2013, he indicated that he had been overseas for a while and had not taken his medication for two months. Nevertheless, his treating physician, Dr. Attoussi made conclusory statements in February 2011 and August 2012, stating claimant would be unable to work for the following six months due to his health conditions. By reference, Ex. B1A.

Review of evidence during the applicable timeframe revealed that little had changed in the claimant's overall medical condition.

The claimant continued to receive primary care from Said Attoussi, M.D. He also returned for refills of medication on January 17, 2014, stating that he also needed a new glucometer, "reports left other one overseas." Ex. B3F, p. 87. Further, as discussed below, he again traveled to Iraq and spent approximately five months there in 2015.

It should be noted that throughout treatment with Dr. Attoussi, impression typically included uncontrolled diabetes. However, no actual blood glucose levels could be found in Dr. Attoussi's these [sic] records. Additionally, the claimant continued [to] deny endocrine symptoms as discussed below.

On March 22, 2014, he returned for refills of medications and had complaints of fatigue, which had been ongoing for three months. However, review of systems was only positive for chronic low back pain. He actually denied fatigue, joint pain/swelling/stiffness, leg cramps and sciatica. His surgical history included

hernia repair in 2008 and 2010. He was also described as pleasant and well-nourished. His blood pressure was 133/76. Examination revealed clear lungs and normal upper extremity joints. Regarding the lower extremity joints, notes simply stated chronic back pain. Primary impression was diabetes mellitus, type II and back pain. Treatment included Omeprazole, Lantus solution and Lortab. Ex. B3F, pp. 93–94.

On April 9, 2014, nerve conduction studies were performed for claimant's complaints of ongoing back and neck pain, associated with radiation into the bilateral upper extremities and index and middle fingers, which had reportedly been present for many years. There was electrodiagnostic evidence of bilateral carpal [tunnel] syndrome, at least moderate in intensity and slightly worse in appearance on the left. However, there was no evidence of any other focal neuropathy, plexopathy or active cervical radiculitis from C5–Tl. Ex. B6F, pp. 1 and 3.

Regarding chronic low back pain, the claimant denied the following on April 22, 2014: fall, direct trauma, radiation of pain, tingling, numbness, even prior imaging (despite lumbar x-rays discussed above), fatigue, polydipsia, heat/cold intolerance and sleep disturbance. Examination was essentially normal. Neurologically, sensory was "normal;" motor strength was "normal" bilaterally; coordination was "normal." Reflexes were two-plus. Babinski was negative. Gait was "normal." There was also no clubbing, cyanosis or edema of the extremities. Regarding the abdomen, there was no palpable mass, no hernia, no tenderness and no guarding. Impression included non-insulin diabetes mellitus, uncontrolled and back pain. Ex. B3F, pp. 96–97.

On June 7, 2014, the claimant reported that he had fallen at home and hurt his back. Interestingly, he denied cervical/neck pain and even carpal tunnel syndrome upon review. His blood pressure was 135/76. Examination was unchanged from that described in April 2014. Ex. B3F, pp. 102–103.

Regardless, Dr. Attou[s]si provided a July 16, 2014 letter stating claimant was unable to work for the next six months due to his health conditions (Ex. B1F, p. 1). This was essentially an exact duplicate of the letters discussed above in the prior decision. Ex. B1A.

MRI's of the cervical and lumbar spines were performed on July 31, 2014. Cervical results revealed no abnormal signal in the spinal cord; within normal limits alignment and preserved facet joint alignment; degenerative changes with no central stenosis or neuroforaminal stenosis from C2-3; mild central canal stenosis at C3-4 and C4-5; borderline mild central canal stenosis at C5-6; severe neuroforaminal stenosis on the right at C6-7 and moderate neuroforaminal stenosis on the right at C3-4, C4-5 and C6-7; moderate right greater than left neuroforaminal stenosis at C5-6; and mild neuroforaminal narrowing at other levels. Lumbar results revealed mild degenerative disc disease desiccation at L4-5 and L5-S1 with associated mild broad-based diffuse disc bulges; and no lumbar spinal stenosis or nerve root impingement. Attached to these imaging studies were laboratory results

showing a blood glucose level of 151. Ex. B9F, pp. 11–15.

In the interim, a physician at Nashville Eye Associates performed an examination on July 20, 2014. He was reportedly having trouble reading with "readers." He also stated that his blood glucose was 217, apparently for 10 days and then 400. However, he denied any endocrine, ear, nose, throat, arthritis, respiratory, neurological and even psychiatric problems upon review. He was also described as fully oriented with appropriate mood. All of the following was within normal limits upon dilation: size, appearance, retinas, and vessels. There was also no BDR (background diabetic retinopathy). He returned on August 14, 2014, at which time he reported his morning blood glucose was 135. Examination was unchanged. It was unclear as to what his actual corrected visual acuity was. However, he was apparently given [a] prescription for corrective lenses. He was to return in one year. Ex. B2F.

Examination continued to show a pleasant well-nourished individual with normal sensory, normal strength, normal coordination and normal gait; with blood pressure of 113/77 on September 2, 2014. His complaints were that he was feeling very tired and weak. Interestingly, impression of Dr. Attoussi included diabetic retinopathy, contrary to the eye examination discussed above. Ex. B3F, pp. 116–117.

In the interim[,] however (August 11, 2014), he presented to West Sports Medicine with complaints of increasing and severe radicular neck and back pain, extending into the bilateral upper extremities, down to the left 4th finger and right hand and down the left lower extremity to the medial calf. Symptoms were also associated with numbness and weakness. They had also been ongoing for several years. David West, D.O., noted results of previously performed cervical and lumbar MRI's and nerve conduction studies. He also described the claimant as overall: "well nourished, well developed, in no acute distress, normal body habitus, no deformities, well groomed, no assistive devices, atraumatic, cooperative, health appearance, pleasant and relaxed." Despite the essentially normal examination, less than one month later (discussed above); current examination revealed tenderness throughout the cervical and lumbar musculature; bilateral trapezius; and reduced cervical and lumbar range of motion, also performed with pain. There was also 4/5 strength of the bilateral biceps, triceps and wrists, worse on the right; and hamstrings; and decreased sensation over the bilateral lateral for, thumb and index finger. However, strength was otherwise 5/5 and sensation was otherwise intact. Additionally, median, radial, ulnar nerves were intact. Appearance of the shoulders, arms and hands was normal. Overall appearance of the legs was normal. The knees, ankles and feet were stable. Further, he was alert, oriented with normal mood and affect. Impression was cervalgia, lumbago, neuralgia/neuritis and carpal tunnel syndrome. Naprosyn and Prednisone were prescribed. Ex. B13F, pp. 22–25.

In attempt to fully ascertain [the] claimant's mental status, staff from the Disability Determination Section requested a psychological examination. Deborah E. Doineau, Ed.D., conducted this assessment on November 22, 2014. Interestingly, his wife assisted him as he walked into the examining room. However, he did not

require assistance as he left. He also stated that he had not been able to return to work because of his physical condition. He presented as neatly groomed and with average hygiene. His symptoms were also rather unimpressive. He had been depressed over his physical condition. His energy level was low. He had trouble concentrating. He could sometimes not remember things. When asked about his memory problems, he stated "a little bit." He had no money, was limited in what he could do, wanted to be working and was frustrated. Regarding mental health treatment, this included being seen by several psychiatrists around 2009 or 2010; and being prescribed Trazodone and Citalopram. However, he simply stopped taking medication, stating it was not helpful.

He also relayed his history. He was born in Iraq. He quit school for two years between middle and high school. He learned to read adequately. He subsequently completed his secondary education and [went] to university for a year and a half where he studied technology. During that time, he was apparently drafted into the military. He refused to go and was sent to jail for six to seven months. He was released, left Iraq in 1991, and came to the United States in 1996. He worked in Iraq and the United States, always in restaurants. He was a cook and "is" able to make Arabic, Italian, Greek, and American food. His last job was working as an assistant server and cook at StockYard restaurant in May 2008; apparently right after that he had hernia surgery and was never able to go back to work. He did get along with others while working.

He lived with his wife and three children, aged 8, 6, and 5. They received food stamps and Families First benefits. Regarding activities of daily living, he slept on the couch much of the time and slept okay at night. He spent most of his time drinking hot tea, watching television or getting on [h]is children's iPad. He might get on Facebook. He helped his children with homework. He was not physically able to do chores. His wife "even has to help him bathe and dress." He did sometimes drive to the store if his wife was real busy and did not have the time. However, he sometimes accompanied his wife to the store because he just had to get out of the house. He sometimes drove to doctor appointments. Sometimes, he and his wife would go to the park and watch the children play. He was able to read his mail and keep up with appointments. He knew how to pay bills and make his own decisions. He contemplated going back to the mosque "today" following this assessment. He also had friends who were supportive and he was always nice to them, but he was not as sociable as he used to be.

He was fully oriented. He had an accent, but his speech was coherent, goal-directed and fully comprehensible. Memory seemed intact for details requested of him. Mood was described as "tired and sad." Affect was within normal range. There was no evidence of psychosis. He was not suicidal or homicidal. Thought process did not reveal loosening of associations, circumstantial or tangential thinking. Insight appeared to be limited. Judgment appeared to be intact. Psychomotor status was within normal limits. On testing, he knew the name of the U.S. president, colors of the American flag and shape of a ball. He recalled three of three words after a five-minute delay. He spelled the word "world" forward and backward. He talked about

politics in Iraq when asked to cite a current event. He was felt functioning within the average range of intelligence. Impression was unspecified depressive disorder. The examiner determined the claimant had mild limitation in all functional realms: understanding or remembering; sustaining concentration or pace; social interaction; and adaptability. Ex. B4F.

Primary impression of Dr. Attoussi on December 1, 2014 was actually diabetic retinopathy (to reiterate, there was no evidence of retinopathy during eye examination). The claimant also made no mention of any eye/vision problems during this office visit. He did report joint pain.

However, reasons for visit were refills of medication and a testosterone injection. He also denied the following: fatigue; weakness; and any pain, to include cervical/neck pain, thoracic pain, low back pain, and joint pain; joint swelling; left cramps; sciatica; fracture and carpal tunnel syndrome. His blood pressure was 133/82. He was described as well-nourished and pleasant. Examination, likewise, was essentially normal except for muscle tenderness on palpitation. This included "normal" upper and lower extremity joints, ["]normal" cervical and lumbosacral spines; "normal" motor strength; "normal["] sensation; "normal" coordination; "normal" gait; and two-plus reflexes and negative Babinski's. Regarding "uncontrolled" non-insulin dependent diabetes, Victoza sample was provided. Norco was continued. Testosterone injection was administered. Ex. B14F, pp. 51–53.

There was essentially no further evidence until May 4, 2015, when claimant returned to Dr. Attoussi; and when he continued to deny all of the symptoms described in detail above. On June 29, 2015, he did report low back pain, but again continued to deny all of the symptoms described otherwise. Examination continued to reveal normal sensation, normal strength, normal coordination and normal gait. Nevertheless, Dr. A[t]toussi started Percocet. Ex. B14F, pp. 39–40.

On August 8, 2015, the claimant presented to Elam Mental Health, telling Kenneth Oslezagha, M.D., that he was an established patient of the clinic and was last seen in 2014 (despite admitting in the psychological evaluation that he had not been seen mentally since 2010). He also reported a history of major depressive disorder with psychotic features. He drove himself from Bell Road where he lived with his family. He also said that since May, following his return from a visit home to Iraq, he had been having difficulty falling or staying asleep. Symptoms included worsening depressed mood, anhedonia, feeling hopeless and helpless, and fleeting suicidal ideation. Additionally, he was becoming very irritable and short-fused. Three days ago, he drove toward Memphis and along the way, he thought of smashing his car into a rock. But, the thought of his family stopped him. He also told his wife about this and she encouraged him to come to the office. Stressors included his elder brother passing away last year, who was his main financial support and being without medications while traveling to Iraq. He denied elevated mood, racing thoughts, goal-directed activities and suicidal ideation. He was in no acute distress. He presented with good grooming and hygiene. He was cooperative

with occasional tearing. Speech was of normal rate, rhythm and volume. Mood was "Depressed." Affect was mood-congruent. Regarding attention/concentration, he was able to spell his last name backward. Thought process was linear. Thought content was without delusional thinking. Impression was major depressive disorder, moderate. Trazodone and Citalopram were prescribed. Ex. B12F.

After this brief interaction with the claimant, Dr. Oslezagha completed an assessment of the claimant's ability to work, finding him with no limitation in the ability to understand, remember and carry out short, simple instructions; marked limitations in the ability to understand, remember and carry out detailed instructions; moderate limitations in the ability to make judgments on simple work-related decisions; and moderate limitations in social interaction and in adaptation. He also stated that claimant's attention, concentration and memory were all poor. He explained these limitations by the following: claimant was currently suffering from moderate depression with somatization symptoms, such as irritability and anger outbursts. He was also very isolative. Ex. B7F.

The claimant was given a new prescription for glasses when he returned for his annual eye examination on August 20, 2015. Examination continued to show no evidence of diabetic retinopathy. Ex. B8F.

When he returned to Elam Metal Health on August 22, 2015, he reported that medications were not working. However, he also stated, "I am OK now." Mood was mildly constricted. He was calm and cooperative. He was fully oriented. Thought process was logical and goal-directed. He also denied side effects from medication, manic and psychotic symptoms, suicidal/homicidal ideation, delusions, and auditory/visual hallucinations. Mohammad Jaleel, M.D., continued Citalopram, prescribed Remeron and discontinued Trazodone. Ex. B12F.

He presented to the emergency room on October 18, 2015 with complaints of lumbar pain of only one-day duration. His pain occurred spontaneously with no mechanism. He also denied radiation of pain, headache, generalized weakness, fatigue, abdominal pain, neck pain, thoracic pain, extremity pain and swelling. He was described as alert, oriented, cooperative and in no acute distress. His blood pressure was 108/63. Examination revealed tenderness of the paraspinal musculature; no motor deficit; no sensory deficit and normal gait. He was released in stable condition with diagnosis of back pain approximately 30 minutes after presentation. Ex. B9F.

He returned to West Sports Medicine on December 15, 2015, stating he did not have time or patience for physical therapy. Ex. B13F, p. 11. He returned on December 23, 2015, with complaint of bilateral knee pain of 10-year duration. Associated symptoms included gait abnormality, joint crepitus, swelling and weakness. He denied any other symptom upon review, to include difficulty sleeping, fatigue, abdominal pain, dysuria, urinary incontinence, cold/heat intolerance, lightheadedness, headache, anxiety and depression. Examination revealed tenderness over the knee, apparently bilaterally, but not stated; decreased

range of motion performed with pain and mild effusion. Regarding the upper extremities overall[,] median, radial and ulnar nerves remained intact. Appearance of shoulders, arms and hands remained normal. Overall inspection of the spine, ribs, pelvis revealed normal thoracic and lumbar sacral spinal alignment and benign ribs. Lower extremity sensation was intact. Impression was simply pain in left knee and pain in right knee. Treatment included right knee injection, right hinge knee brace, and physical therapy. Ex. 13F, pp. 6–8.

During the February 6, 2016 mental health session, the claimant stated "something coming up, my ghost tell me come to Nashville from Detroit." Despite being prescribed medications at [his] last visit, he had not started any new medications and had run out of Citalopram 30 days ago. He endorsed a myriad of symptoms. However, he again stated that he was okay. His sleep and concentration were okay when he took his medication. He reiterated that his brother used to support him; his brother passed away last year and he had no money. He also reported that yesterday, he spent this happily with his wife and kids. He went to the mall. He spent similar quality time like this three years ago. Mostly, he did not want to go due to financial issues. Despite his reports of his ghost, he denied psychotic and manic symptoms and side effects from medication. Mood was "sad." Affect was interactive and sad at times. He remained calm and cooperative. He remained fully oriented. Speech remained normal. Thought process remained logical and goal-directed. Shahid Ali, M.D., re-started Citalopram and Trazodone. Ex. B12F.

He returned 11days later reporting hallucination and paranoia. He said that he saw a ghost and "they talk to him and are trying to get him." However, he also denied command hallucinations. He also reported continued depression and increased suicidal ideation, occurring several times per week. However, he denied suicidal ideation. He also endorsed difficulty sleeping, anhedonia and apathy. However, he denied hopelessness and helplessness. Mood/affect was depressed and mood congruent. However, thought content was with no delusions or obsessions. Thought process was logical and goal-directed. He remained alert and fully oriented. He remained calm and cooperative. Impression of Sabur Aleema, M.D., was severe recurrent major depressive disorder with psychotic features. Citalopram was increased. Haldol and Cogentin were started. He was to return in two weeks. Ex. B12F. However, there were no further mental health records.

He presented to Dr. Attoussi on February 4, 2016 for paperwork and reported dizziness and rash on his neck. Review of systems also revealed tingling/numbness and low back/joint pain; yet no other pain; no endocrinology symptoms, no headache, memory loss, or gait abnormality. His blood pressure was 116/85. Examination continued to show normal sensation, strength, coordination and gait. Regardless, Dr. Attoussi comp[l]eted an assessment of the claimant's ability to perform work, finding the claimant able to: lift and carry 20 pounds occasionally and 10 pounds frequently; stand and walk about four hours in an eight-hour workday with normal breaks; sit about fours [sic] hours in an eight-hour workday with normal breaks with the opportunity to shift positions at will; the need to lie down at unpredictable intervals during an eight-hour work shift; frequently twist

and climb stairs and ladders; occasionally stoop and bend; frequently reach in all directions including overhead, handle, finger and feel bilaterally; occasionally push/pull bilaterally; with no environmental restrictions; and would be absent from work about four days per month. Ex. B14F, pp. 11–12 and Ex. B10F, respectively.

MRI's of the bilateral knees were performed on February 11, 2016. Left knee result revealed: mild dysplasia of the femoral trochlear groove and mild lateral patellar tilt; focal chondral fissure of the medial inferior aspect of the femoral trochlear grove with marrow edema; moderate to severe degeneration of the anterior cruciate ligament with mucinous changes; no ligamentous disruption; mild diffuse semi-membranosus tendinosis; findings likely representing a sequestered portion of a Baker's cyst; and edema of the suprapatellar and infrapatellar fat pads suggestive of intermittent fat pad impingement; recommend clinical correlation. Right knee results revealed: moderate diffuse chondromalacia patella with mild subchondral cyst formation and marrow edema; mild subchondral narrow edema of the medial inferior aspect of the femoral trochlear groove likely related to an occult fissure of the overlying cartilage; mild dysplasia of the femoral trochlear groove and mild lateral patellar tilt; 5 mm intra-articular osteochondral body in the posteromedial aspect of the knee; and mild diffuse semi-membranosus tendinosis. Ex. Bl lF.

West Sports Medicine notes of May 20, 2016, stated that that [sic] this time, claimant reported left knee greater than right knee pain. He continued to deny a myriad of symptoms, to include anxiety and depression. Bilateral knee MRI results were noted. Examination revealed tenderness over the patella tendon, medial and lateral joint lines and mild effusion, crepitus, range of motion to 20 degrees, and pain with flexion and extension. Regarding stability, medial McMurray's was positive. However, Lachman and anterior drawer testing was negative. Lower extremity sensation remained intact to light touch. Left knee arthroscopy was planned. Sarah Ray (no professional status annotated) examined claimant. Dr. David West approved of this plan. Ex. B13F, pp. 1-5.

On June 22, 2016, Dr. Attoussi provided one of his standard letters stating claimant "is" unable to work for the next months due to his health conditions (though this time as indicated, he omitted six months). These included diabetes, type II, hypertension, hyperlipidemia, chronic back pain and depression. Ex. B15F.

As typical, examinations through August 17, 2016 continued to show a pleasant, well-nourished individual with normal sensation, normal motor strength, normal coordination and normal gait with two-plus reflexes. His blood pressures were also typically normal with readings, such as 122/70 and 113/72. Ex. B14F, pp, 6, 4 and 2, respectively.

William R. Huffman, M.D., consultatively examined the claimant, post-hearing on November 10, 2016. The claimant stood 65 inches tall and weighed 204 pounds. His blood pressure was 128/83. His uncorrected visual acuity was 20/60, bilaterally. Dr. Huffman felt that he probably needed glasses. Examination also revealed non-tender abdomen with no organomegaly or mass. Range of motion testing revealed:

30 degrees flexion, 15 degrees extension and 20 degrees right/left lateral flexion of the dorsolumbar spine with severe pain on range of motion in the lumbosacral regions of the back; 30 degrees abduction, 15 degrees adduction, 90 degrees flection, 30 degrees extension and internal rotation, and 45 degrees external rotation of the bilateral hips; 110 degrees flexion and 0 degrees extension of the right knee with pain on motion maneuvers; 120 degrees flexion and 0 degrees extension with pain on motion maneuvers of the left knee; yet no effusion. Range of motion was universally normal otherwise, to include the cervical spine and bilateral wrists, though he had pain with motion maneuvers. Tinel's signs were also negative bilaterally. He walked with short steps, otherwise, gait and station were normal. Cranial nerves were intact. Motor strength in all four extremities was 5/5. Cerebellar function was normal. He had good finger-to-nose and negative Romberg's bilaterally. He was unable to perform heel-to-toe walking due to severe back pain. Straight leg raising was positive at 30 degrees. However, he was able to perform one-leg stands without difficulty. There w[ere] no neurosensory deficits. "The rest of the neurological examination was normal and the rest of the physical examination was normal." Dr. Huffington [sic] stated per notes that claimant would not be able to lift over 10 pounds; could sit for up to four hours per day; stand for up to two hours per day; and walk up to three hours per day. He also stated claimant required a cane; for walking and could not walk without the cane for more than 50 yards.

Dr. Huffington [sic] also completed an assessment of the claimant's ability to work, finding the claimant able to lift and carry no more than up to 10 pounds continuously; sit four hours total in an eight-hour workday (15 minutes at one time); stand two hours total in an eight-hour workday (10 minutes at a time); walk three hours in an eight-hour workday (five minutes at a time); required a cane to ambulate; frequently reach overhead, continuously reach in all other directions; continuously handle, finger and feel; occasionally push/pull (all bilaterally); frequently operate bilateral foot controls; never climb ladders or scaffolds, kneel or crouch; occasionally climb ramps/stairs, balance, stoop and crawl; never tolerate exposure to unprotected heights; occasionally tolerate exposure to moving mechanical parts and operating a motor vehicle; and frequently tolerate exposure to humidity/wetness, all pulmonary irritants and extreme cold/heat; and continuously tolerate exposure to vibration. Dr. Huffman also opined the claimant could not travel without companion for assistance, walk a block at a reasonable pace on rough/uneven ground, or climb a few steps at a reasonable pace with use of single handrail. However, he could do all of the following: perform activities like shopping; ambulate without assistive device (despite his earlier statements that claimant required cane to ambulate); use standard public transportation; prepare a simple meal and feed himself; care for personal hygiene; and sort, handle and use paper/files. Ex. B16F.

(Tr. 22–29.)

The ALJ summarized Jaari's hearing testimony as follows:

The claimant testified that he has not worked since the last hearing. He lives in a townhouse with his wife and three kids ages 13, 11 and 7. His wife does not work. He has diabetes. He takes insulin three times a day and two other medications. His blood sugars range from 317 to 400 – it was 534 not long ago. He uses a meter to check his blood sugar two times a day and sometimes more often. His symptoms include blurry vision, kidney problem and weakness. He was [sic] a lower back disc problem (bulging). He takes medicine three times a day. He has problems with his neck, which started in 2013 – disc problems there too. He is scared of surgery. He rates back pain as a 5–8 and neck pain as 7–8 on the pain scale. He needs surgery on both wrists. If he holds something like a glass or something, he drops them. When he cooks, he cannot lift heavy stuff, as he drops things. He takes medicine at night to sleep. He had tests on both knees and needs surgery on both knees. He is scared to get surgery due to hernia in his abdomen. He has had three hernia surgeries. The hernias are not repaired.

Regarding symptoms of depression, he testified that when driving once, he stopped in the middle of the highway because something in the back of the car told him to stop, like a ghost. He stopped at the next exit. The girl there called the police [sic] of his statement. The ghost comes to him at times. He is scared to go to the mental hospital. He goes to a psychiatrist. They change doctors from time to time.

He testified that he remembers having a hearing before ALJ Dougherty. Nothing has changed since then, but medications have changed. He traveled to Iraq to see his mother. Family members are still there. He flew British Airlines and made a connection in Turkey. Flight was 13–14 hours. He traveled with a friend. He was in Iraq for five months, as his mom was sick. She cannot move. His sister and others take care of her. He stayed in her home when there. His brother sent money for him to travel to Iraq. He (brother) still takes care of him. He has tried to work with his friend and cannot. He last worked in 2010. The claimant further testified that his back and knees kill him when standing. He also testified the bone in his right elbow also bothers him.

He said he took along with him, enough medicine while visiting Iraq. He has been in the hospital twice this year for his back. They gave him shots in his back. Medicine made his back pain worse. He can speak and write in English. He trained for a cashier job. He has "impatience to deal with customers" (testimony).

(Tr. 30–32.)

## IV.   Legal Standard

### A.   Standard of Review

This court reviews the final decision of the SSA to determine whether substantial evidence

supports that agency's findings and whether it applied the correct legal standards. *Miller v.*

*Comm'r of Soc. Sec.*, 811 F.3d 825, 833 (6th Cir. 2016). Substantial evidence means "'more than a mere scintilla' but less than a preponderance; substantial evidence is such 'relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (quoting *Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001)). As the United States Supreme Court recently explained:

> The phrase "substantial evidence" is a "term of art" used throughout administrative law to describe how courts are to review agency factfinding. *T-Mobile South, LLC v. Roswell*, 135 S. Ct. 808, 815 (2015). Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains "sufficien[t] evidence" to support the agency's factual determinations. *Consol. Edison Co. v. NLRB*, 305 U. S. 197, 229 (1938) (emphasis deleted). And whatever the meaning of "substantial" in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence, this Court has said, is "more than a mere scintilla." *Ibid.*; *see, e.g.*, *Richardson v. Perales*, 402 U. S. 389, 401 (1971) (internal quotation marks omitted). It means—and means only—"such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison*, 305 U.S. at 229. *See Dickinson v. Zurko*, 527 U. S. 150, 153 (1999) (comparing the substantial-evidence standard to the deferential clearly-erroneous standard).

*Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). In determining whether substantial evidence supports the agency's findings, a court must examine the record as a whole, "tak[ing] into account whatever in the record fairly detracts from its weight." *Brooks v. Comm'r of Soc. Sec.*, 531 F. App'x 636, 641 (6th Cir. 2013) (quoting *Garner v. Heckler*, 745 F.2d 383, 388 (6th Cir. 1984)). The agency's decision must stand if substantial evidence supports it, even if the record contains evidence supporting the opposite conclusion. *See Hernandez v. Comm'r of Soc. Sec.*, 644 F. App'x 468, 473 (6th Cir. 2016) (citing *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)).

Accordingly, this court may not "try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility." *Ulman v. Comm'r of Soc. Sec.*, 693 F.3d 709, 713 (6th Cir. 2012) (quoting *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007)). However, if an ALJ fails to follow agency rules and regulations, the decision lacks the support of substantial evidence, "even where the conclusion of the ALJ may be justified based upon the record." *Miller*, 811 F.3d at 833 (quoting

*Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 722 (6th Cir. 2014)).

### B. The Five-Step Inquiry

The claimant bears the ultimate burden of establishing an entitlement to benefits by proving his or her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The claimant's "physical or mental impairment" must "result[] from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." *Id.* § 423(d)(3). For purposes of this case, the regulations governing disability determination for DIB and SSI benefits are identical. *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007) (citing 20 C.F.R. §§ 404.1520, 416.920). The SSA considers a claimant's case under a five-step sequential evaluation process, described by the Sixth Circuit Court of Appeals as follows:

1. A claimant who is engaging in substantial gainful activity will not be found to be disabled regardless of medical findings.

2. A claimant who does not have a severe impairment will not be found to be disabled.

3. A finding of disability will be made without consideration of vocational factors, if a claimant is not working and is suffering from a severe impairment which meets the duration requirement and which meets or equals a listed impairment in Appendix 1 to Subpart P of the Regulations. Claimants with lesser impairments proceed to step four.

4. A claimant who can perform work that he has done in the past will not be found to be disabled.

5. If a claimant cannot perform his past work, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed.

*Parks v. Soc. Sec. Admin.*, 413 F. App'x 856, 862 (6th Cir. 2011) (citing *Cruse v. Comm'r of Soc.*

*Sec.*, 502 F.3d 532, 539 (6th Cir. 2007)); 20 C.F.R. §§ 404.1520, 416.920. If the ALJ determines at step four that the claimant can perform past relevant work, the claimant is deemed "not disabled," and the ALJ need not complete the remaining steps of the sequential analysis. *Id.* § 404.1520(a). "Past relevant work" is defined as work that claimants have done within the past fifteen years that is "substantial gainful activity" and that lasted long enough for the claimant to learn to do it. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006) (citing 20 C.F.R. § 404.1560(b)(1)).

The claimant bears the burden through step four of proving the existence and severity of the limitations his impairments cause and the fact that he cannot perform past relevant work; however, at step five, "the burden shifts to the Commissioner to identify a significant number of jobs in the economy that accommodate the claimant's residual functional capacity . . . .'" *Kepke v. Comm'r of Soc. Sec.*, 636 F. App'x 625, 628 (6th Cir. 2016) (quoting *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004)). The SSA can carry its burden at the fifth step of the evaluation process by relying on the Medical-Vocational Guidelines, otherwise known as "the grids," but only if a nonexertional impairment does not significantly limit the claimant, and then only when the claimant's characteristics precisely match the characteristics of the applicable grid rule. *See Anderson v. Comm'r of Soc. Sec.*, 406 F. App'x 32, 35 (6th Cir. 2010); *Wright v. Massanari*, 321 F.3d 611, 615–16 (6th Cir. 2003). Otherwise, the grids only function as a guide to the disability determination. *Wright*, 321 F.3d at 615–16; *see also Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990). Where the grids do not direct a conclusion as to the claimant's disability, the SSA must rebut the claimant's *prima facie* case by coming forward with proof of the claimant's individual vocational qualifications to perform specific jobs, typically through vocational expert testimony. *Anderson*, 406 F. App'x at 35; *see Wright*, 321 F.3d at 616 (quoting

SSR 83-12, 1983 WL 31253, at *4 (Jan. 1, 1983)).

When determining a claimant's residual functional capacity (RFC) at steps four and five, the SSA must consider the combined effect of all the claimant's impairments, mental and physical, exertional and nonexertional, severe and non-severe. *See* 42 U.S.C. §§ 423(d)(2)(B), (5)(B); *Glenn v. Comm'r of Soc. Sec.*, 763 F.3d 494, 499 (6th Cir. 2014) (citing 20 C.F.R. § 404.1545(e)).

## V.    Analysis

Jaari argues that the ALJ erred in "not weighing the opinion of Dr. Oslezagha," "not addressing manipulative limitations and a combination of impairments after finding CTS (carpal tunnel syndrome) as a severe impairment," and "failing to find severe mental impairments" or alternatively, failing to "address[] mental limitations in his RFC." (ECF No. 18, PageID # 688–89.) The SSA responds that substantial evidence supported the ALJ's decision and, in any event, the ALJ documented his consideration of Dr. Oslezagha's opinion and properly evaluated Jaari's carpal tunnel syndrome and his mental health impairments. (ECF No.19, PageID# 693–94, 695–702.)

### A.  The ALJ Properly Considered Dr. Oslezagha's Report

Jaari argues that the ALJ failed to consider Dr. Oslezagha's medical source statement under the treating source rule. Social Security regulations and rulings address the manner in which all medical opinions are considered. *See* 20 C.F.R. §§ 404.1527, 416.927 (evaluating medical opinions).[2] The regulations describe three types of medical opinions: non-examining sources,

---

[2]    On January 18, 2017, the SSA published final rules titled "Revisions to Rules Regarding the Evaluation of Medical Evidence," which included significant changes in the consideration of medical opinion evidence. 82 Fed. Reg. 5844. *See also* 82 Fed. Reg. 15132 (March 27, 2017) (amending and correcting the final rules published at 82 Fed. Reg. 5844). SSRs 96-2p, 96-5p, and 06-03p were rescinded as of March 27, 2017, and the guidance previously included in those rulings was partially incorporated in a new version of 20 C.F.R. § 404.1527 ("Evaluating opinion evidence for claims filed before March 27, 2017). *See* 82 FR 15263 (March 27, 2017). This was the regulation that was in effect at the time of the ALJ's decision here. The SSA has provided

examining but non-treating sources, and treating sources. *See id.*; 20 C.F.R. § 416.902 (terms defined). A non-examining source is a physician, psychologist, or other acceptable medical source who has not examined the claimant but provides a medical or other opinion in the claimant's case. *Id*. An examining but non-treating source has examined the claimant but does not, or did not, have an ongoing treatment relationship with the claimant, while a treating source has examined the claimant and has (or had) an ongoing treatment relationship that was consistent with accepted medical practice. *Id*.

Under the regulations, a treating physician's opinion is due "controlling weight," if that opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record." 20 C.F.R. §§ 404.1527, 416.927. If the opinion of a treating physician cannot be given controlling weight, the ALJ is required to provide "good reasons" for discounting the weight given. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). This requirement "ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule." *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013) (quoting *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004)). For all other medical opinions, the ALJ is required to "evaluate" them and "consider all of the following factors in deciding the weight" to give them: the "examining relationship," "treatment relationship," "length of the treatment relationship and the frequency of examination," "nature and extent of the treatment relationship," "supportability," "consistency," "specialization," and "other factors" the claimant brings to the ALJ's attention. 20 C.F.R. § 404.1527(c)(2).

---

explanations to the public in addition to the Federal Register notices and includes questions and answers to frequently asked questions about the regulatory revisions. *See* "Revisions to Rules Regarding the Evaluation of Medical Evidence," available at https://www.ssa.gov/disability/professionals/bluebook/revisions-rules.html.

However, the ALJ is not required to explicitly discuss each of these factors. *Edwards v. Comm'r of Soc. Sec.*, No. 1:14-CV-0832, 2016 WL 54690, at *6 (W.D. Mich. Jan. 5, 2016).

Dr. Oslezagha saw Jaari for a single visit on August 8, 2015. Having seen Jaari only one time, Dr. Oslezagha does not qualify as a treating physician. *See Miller v. Berryhill*, No. 3:17-CV-01439, 2019 WL 1429259, at *9 (M.D. Tenn. Mar. 29, 2019) (finding that two examinations, six weeks apart, "did not make Dr. Denton a treating physician, as they 'did not give Dr. [Denton] a long[-]term overview of [Miller's] condition'" (quoting *Yamin v. Comm'r of Soc. Sec.*, 67 F. App'x 883, 884 (6th Cir. 2003))); *see also Downs v. Comm'r of Soc. Sec.*, 634 F. App'x 551, 556 n.2 (6th Cir. 2016) (explaining that "the handful of visits [the claimant] had with Dr. Murphy do not necessarily render Dr. Murphy a 'treating source' with an 'ongoing treatment relationship' with [the claimant]" (citing 20 C.F.R. § 404.1502)); *Helm v. Comm'r of Soc. Sec.*, 405 F. App'x 997, 1000 n.3 (noting that "it is questionable whether a physician who examines a patient only three times over a four-month period is a treating source—as opposed to a nontreating (but examining) source"); *Boucher v. Apfel*, No. 99-1906, 2000 WL 1769520, at *9 (6th Cir. Nov. 15, 2000) (finding that a doctor who had examined the claimant three times over a two-year period was "not a treating source").

Because Dr. Oslezagha was not a treating physician, the ALJ had no obligation to give "good reasons" for rejecting his medical opinion. *See, e.g.*, *Wilson*, 378 F.3d at 545; *see also Karger v. Comm'r of Soc. Sec.*, 414 F. App'x 739, 744 (6th Cir. 2011) (noting that where a treating source was no longer treating the claimant on the date of the treating sources opinion, the ALJ was "not . . . under any special obligation to defer to that opinion or to explain why he elected not to defer to it"). At best, Dr. Oslezagha qualified as "a nontreating (but examining) source." *Helm*, 405 F. App'x at 1000 n.3. The ALJ explicitly considered Dr. Oslezagha's medical source statement

in his decision. The ALJ noted that Dr. Oslezagha's medical source statement was completed "after [one] brief interaction" with Jaari. The ALJ carefully documented Dr. Oslezagha's findings, thoroughly considered the evidence in the administrative record, including the dearth of evidence from mental health providers, and determined that Jaari's mental impairments were non-severe. The ALJ gave great weight to Doineau's opinion, finding that Jaari had only mild limitations (Tr. 444–45), and to the opinions of the two agency consultants, Rebecca Joslin, Ed.D., and Pilar Vargas, M.D., that Jaari had no severe mental impairments based on the absence of consistent treatment and lack of mental health evidence (Tr. 101–02, 125–27, 135-38). The ALJ implicitly rejected Dr. Oslezagha's opinion, to the extent it conflicted with the record as a whole. *Ridge v. Comm'r of Soc. Sec. Admin.*, No. 1:18-CV-109, 2019 WL 2524775, at *4 (E.D. Tenn. June 19, 2019) (recognizing that "courts have routinely concluded that, in making certain findings, ALJs are implicitly rejecting other evidence" (citing *Marmon v. Sec'y of Health & Human Servs.*, 774 F.2d 1163 (6th Cir. 1985) ("In recognizing this pain but concluding that appellant did not suffer from a severe impairment, the Secretary implicitly rejected appellant's testimony alleging severe pain.")); *see also Dutkiewicz v. Comm'r of Soc. Sec.*, 663 F. App'x 430, 432 (6th Cir. 2016) (finding that "the ALJ indirectly rejected the conclusion that Dutkiewicz was unable to work by reasonably explaining that the majority of medical evidence, the nature of Dutkiewicz's treatment, and the other medical opinions in the record showed that Dutkiewicz had the capacity to perform a limited range of sedentary work"); *Watters v. Comm'r of Soc. Sec.*, No. CIV.A. 11-13860, 2012 WL 3842281, at *7 (E.D. Mich. June 28, 2012) (finding that the ALJ implicitly provided sufficient reasons to reject the claimant's treating physician's opinion, after outlining the medical evidence and concluding that there was "insufficient evidence to substantiate the existence of a medically determinable impairment prior to December 31, 2007, the date last insured"), *report and*

*recommendation adopted*, No. 11-13860, 2012 WL 3842564 (E.D. Mich. Sept. 5, 2012), *aff'd*, 530 F. App'x 419, (6th Cir. 2013); *Brock v. Comm'r of Soc. Sec.*, 368 F. Appx. 622, 625 (6th Cir. 2010) ("Additionally, the administrative law judge's findings challenge the supportability and consistency of Dr. Moore's diagnoses with the other evidence in the record in an indirect but clear way . . . ."). These determinations are supported by substantial evidence and do not violate SSA regulations.

### B.    The ALJ Properly Considered Jaari's Mental Health Impairments.

Jaari argues that Dr. Oslezagha's opinion identified marked and lesser limitations based upon Jaari's diagnosed depression and his "treatment history with the Elam/Nashville Family dating back to at least 2010," and that the ALJ failed to properly consider this evidence. (ECF No. 18, PageID# 689.) Jaari asserts that the ALJ was required to consider the length, frequency, nature, and extent of the treatment relationship; the supportability of the physician's conclusions; the specialization of the physician; and any other relevant factors. (*Id.*) The SSA responds that the ALJ properly evaluated Jaari's mental impairments and found that they were not severe.

For the reasons explained above, Dr. Oslezagha was not a treating physician and his opinion was not entitled to controlling weight. Instead, his opinion was among the evidence that the ALJ was required to, and did, consider when crafting Jaari's RFC. With respect to evaluating mental impairments, the SSA has promulgated additional regulations that ALJs must follow. These regulations require the ALJ to identify a claimant's limitations in four broad functional areas: activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. *See* 20 C.F.R. §§ 404.1520a(c)(3), 416.920a(c)(3). The ALJ must include in his decision his rationale for reaching conclusions regarding the severity of the mental impairment. *See* 20 C.F.R. §§ 404.1520a(c)(4), 416.920a(c)(4). This analysis is used to evaluate the severity of a claimant's mental impairments and to determine whether he or she meets or equals a listing in

20 C.F.R. pt. 404, subpt. P, app 1. This is expressly not part of the residual functional capacity evaluation. *See* 20 C.F.R. §§ 404.1520a(d), 416.920a(d) (evaluating mental impairments).

The regulations explain that mild limitations suggest that a mental impairment is non-severe. *See* 20 C.F.R. §§ 404.1520a(d)(1), 416.920a(d)(1) ("If we rate the degrees of your limitation as 'none' or 'mild,' we will generally conclude that your impairment(s) is not severe, unless the evidence otherwise indicates[.]" (evaluating mental impairments)). The ALJ's determination that Jaari's mental impairments were only mild, and therefore non-severe, was supported by substantial evidence.

The ALJ evaluated the four functional areas as follows:

Regarding the claimant's medically determinable mental impairment of depressive disorder, this . . . causes no more than minimal limitation in the claimant's ability to perform basic mental work activities and is therefore non-severe.

In making this finding, I have considered the four broad areas of mental functioning set out in the disability regulations for evaluating mental disorders and in the Listing of Impairments (20 CFR, Part 404, Subpart P, Appendix 1). These four areas of mental functioning are known as the "paragraph B" criteria.

The first functional area is understanding, remembering, or applying information. In this area, the claimant has mild limitation. The claimant stated in the function report that he is able to pay bills and count change. He drives. He goes shopping with his wife. He cares for his wife and children with his wife's help (Ex. B5E). He also told the psychological evaluator that he has always been a cook and is able to make Arabic, Italian, Greek and American foods. He goes to the store alone if his wife is "real busy and does not have time." He is able to read his mail, keep up with appointments and make his own decisions (Ex. B4F).

The next functional area is interacting with others. In this area, the claimant has mild limitation. He admitted he does not have any problems getting along with family, friends, neighbors or others; and has never lost a job because of problems getting along with others (Ex. B5E). He told the psychological evaluator that he and his wife go to the park and watch the children play. He was contemplating going back to the mosque following the interview (Ex. B4F). He testified that in 2015, he traveled to Iraq with a friend for five months to visit with relatives. He has consistently been described as cooperative and pleasant throughout treatment.

The third functional area is concentrating, persisting, or maintaining pace. In this area, the claimant has mild limitation. He told the psychological evaluator that he helps his children with their homework. He spends most of his time watching television or gett[ing] on his children's iPad, and may get on Facebook. As discussed above, he reported that he can prepare foods from several different countries. The psychological evaluator determined the claimant is of average intelligence (Ex. B4F). His hobbies are reading and watching television (Ex. B5E). He testified that he traveled to Iraq in 2015 to see his mother. He was on a 13–14 hour flight that connected to Turkey, then to Iraq. He has remained fully oriented with logical/linear thought process during mental status examinations.

The fourth functional area is adapting or managing oneself. In this area, the claimant has mild limitation. The claimant stated that he cares for his personal needs without reminders and cares for his wife and children as well (Ex. B5E). As discussed above, he has consistently been described as cooperative and pleasant during treatment. He testified that he travelled to Iraq last year for about five months without mention of any problems doing so.

Because the claimant's medically determinable mental impairment causes no more than "mild" limitation in any of the functional areas, it is nonsevere (20 CFR 404.1520a(d)(l) and 416.920a(d)(l)).

This will be discussed in detail during evaluation of the evidence.

The limitations identified in the "paragraph B" criteria are not a residual functional capacity assessment but are used to rate the severity of mental impairments at steps 2 and 3 of the sequential evaluation process. The mental residual functional capacity assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment by itemizing various functions contained in the broad categories found in paragraph B of the adult mental disorders listings in 12.00 of the Listing of Impairments (SSR 96-8p). Therefore, the following residual functional capacity assessment reflects the degree of limitation the undersigned has found in the "paragraph B" mental function analysis.

(Tr. 19–20.)[3]

---

[3]     The prior ALJ also found that the "mental condition . . . evidence establishes that he has a mild reduction in his activities of daily living, a mild limitation in social function, a mild limitation in his ability to maintain concentration, persistence, or pace and no episodes of decompensation of extended duration." Under *Drummond v. Commissioner*, 126 F.3d 837, 842 (6th Cir. 1997), absent some significant change in a claimant's condition, an ALJ is generally bound by a prior ALJ's decision. Notably, since the prior ALJ's decision, the evidence establishes that Jaari obtained mental health treatment only four times, which does not suggest a significant change in condition. Moreover, when asked by the ALJ whether there had been any change to his mental health

The ALJ's decision that Jaari's mental impairments were mild and non-severe was supported by substantial evidence. First, the ALJ recognized that the administrative record contained scant evidence regarding Jaari's mental health issues. (Tr. 3.) The evidence establishes that Jaari attended only four meetings at the Elam clinic—two in August 2015 and two in February 2016—despite claiming to have substantial mental health issues. At each visit, he was found to be calm and cooperative; his rate, rhythm and volume of speech were normal; and his thought content was logical and goal-directed. (Tr. 479, 482, 484, 487.) His thought processes were without current suicidal or homicidal ideation or visual or auditory hallucination and did not reveal any delusions or obsessions. (*Id.*) Moreover, Jaari was clear on numerous occasions that his failure to find work and precarious financial situation—being without work and losing his older brother, who had financially supported Jaari and his family—contributed to his depression. (Tr. 443, 445, 481, 486.) Finally, although at each visit Jaari was diagnosed as having moderate and recurrent major depressive disorder, on his last visit he related that his symptoms had gotten worse. (*Compare* Tr. 478 to 481, 484 and 486.) Significantly, although diagnosing him for the first time with severe major depressive disorder with psychotic symptoms, the provider noted at this last visit that Jaari's reliability was only "fair," suggesting that his subjective complaints were not entirely credible. (Tr. 479.) Nevertheless, after this visit there is no evidence that Jaari ever returned to the Elam clinic or any other mental health provider for treatment.

The ALJ also recognized that Jaari was non-complaint with the treatment plan given by his mental health care providers. At each of his mental health appointments, Jaari was prescribed psychotropic medication to help treat his depression. (Tr. 483, 485, 488.) Yet the evidence

condition since his last ALJ hearing, Jaari responded: "Nothing has changed since then, but medications have changed." (Tr. 3, 60.)

establishes that, despite Jaari's claiming that he did not experience any side effects from the medication and that it helped with his symptoms (Tr. 478, 481), the administrative record is replete with evidence that Jaari refused to take his medication as instructed. (*See, e.g.*, Tr. 332–55 (no mention of psychotropic medication in the list of medications Jaari was currently taking); 442, 481, 486, 547–600 (same).) Additionally, because there are no mental health records after Jaari's last visit to the Elam clinic, there is no evidence that he ever took the medication prescribed at his last visit, at which he indicated that he was worse than he had been before. (*See, e.g.*, Tr. 547–600.) Moreover, Dr. Oslezagha was clear that, although Jaari was "currently suffering from major depressive disorder," his condition "can be stabilized on medication." (Tr. 456.) Notably, the regulations require that a claimant "must follow treatment prescribed by your medical source(s) if this treatment is expected to restore your ability to work." 20 C.F.R. § 404.1530. The consequence for failing to comply with a treatment plan without good reason is that the SSA "will not find you disabled or, if you are already receiving benefits, we will stop paying you benefits." *Id.*

The ALJ considered the other mental health evidence in the record and reasonably gave great weight to the opinions of the SSA's two psychological consultants, Rebecca Joslin, Ed.D., and Pilar Vargas, M.D., who determined that Jaari had no severe mental impairments based on the absence of consistent treatment and lack of mental health evidence (Tr. 101–02, 125–27, 135–38). The ALJ also considered the opinion of SSA psychological evaluator Doineau, who found that Jaari had only mild limitations and noted that his depression seemed to stem from his frustration over not being physically able to work. (Tr. 444–45.) Finally, as the ALJ found, the fact that Jaari repeatedly traveled abroad for long periods of time, without access to his mental health providers (or any of his treating physicians) and without his psychotropic medication, belied any suggestion that he is severely impaired by his mental health issues. (Tr. 3.)

Substantial evidence supported the ALJ's determination that Jaari's mental health impairments were non-severe.

## C.     The ALJ Properly Considered Jaari's Carpal Tunnel Syndrome in the Context of the Evidence as a Whole

Jaari argues that the ALJ erred in evaluating the effect of his carpal tunnel syndrome (CTS) on his ability to work. Specifically, Jaari contends that the ALJ found that his CTS was severe, but the RFC the ALJ crafted failed to include limitations considering that diagnosis. The SSA responds that the ALJ properly considered Jaari's CTS diagnosis and included appropriate limitations in the RFC.

The evidence establishes that, as with Jaari's mental health records, there is scant evidence of Jaari's complaining of, or receiving treatment for, CTS. A nerve conduction study on April 9, 2014, showed evidence of bilateral carpal tunnel syndrome, but two months later, during an appointment with treating physician Said Attoussi on June 7, 2014, Jaari denied that he had CTS. (Tr. 332, 449–51.) At his August 8, 2014, appointment at West Sports Medicine, Jaari reported weakness in his "wrists extensors" and "diminished grip strength," but, upon testing, his extension weakness was minimal. (Tr. 510, 512.) As late as his August 17, 2016, appointment with Dr. Attoussi, Jaari continued to deny having CTS. (Tr. 543.) Moreover, the latest evidence in the record, from November 10, 2016, established that "he had normal range of motion with pain on range of motion of both wrists" and "5/5 motor strength in both his upper and lower extremities." (Tr. 629–30.)

Considering this evidence, the ALJ found CTS to be a severe impairment and limited Jaari to the "light" range of work. (Tr. 2) The light range of work is defined in 20 CFR 404.1567(b) and 416.967(b) and includes a limitation that Jaari can lift no more than 20 pounds occasionally and 10 pounds frequently, among other restrictions. *See id.* "Frequent" and "occasional" are defined

terms that set forth the limits for a plaintiff to engage in certain behaviors. "Occasional" means a condition or activity that exists up to one-third of the time, while "frequent" is an activity or condition that exists from one-third to two-thirds of the time, and "constant" is two-thirds or more. *See* Program Operations Manual System (POMS), DI 25001.001, "Medical Vocational Quick Reference Guide," available at https://secure.ssa.gov/apps10/poms.nsf/lnx/0425001001 (visited September 9, 2019).

The ALJ appropriately weighed what little evidence was available and determined that, even with the CTS diagnosis, Jaari could perform light work. *See Rudd v. Comm'r of Soc. Sec.*, 531 F. App'x 719, 727 (6th Cir. 2013) (minimal and conservative treatment supports ALJ's determination that claimant could perform light work). Further, a decrease in grip strength can be accommodated by a restriction to light work. *See Zeiler v. Barnhart*, 384 F.3d 932, 936 (8th Cir. 2004) ("[A]ny loss of Zeiler's grip strength is accommodated by the ALJ's decision that she is limited to light work."); *Clark v. Chater*, 75 F.3d 414 (8th Cir. 1996) (claimant with reduced grip strength could nevertheless perform the full range of light work with limited pushing and pulling). The ALJ's RFC limited Jaari to light work with no more than occasional pushing or pulling and no more than frequent reaching, handling, and feeling. (Tr. 2.) These limitations were crafted consistent with Jaari's CTS impairment. Jaari takes issue with the ALJ's RFC limitations and suggests that the RFC should have included more restrictive manipulative limitations. However, he has not demonstrated that the ALJ failed to consider his CTS impairment, nor has he demonstrated a basis upon which to conclude that greater manipulative limitations beyond those included in the RFC were necessary to account for his CTS diagnosis.

Substantial evidence supported The ALJ's decision and he did not err in his consideration of Jaari's CTS.

## VI.     Conclusion

For the reasons explained above, Jaari's motion for judgment on the administrative record (ECF No. 13) will be denied, and the SSA's decision will be affirmed. An appropriate Order is filed herewith.

_____
ALETA A. TRAUGER
UNITED STATES DISTRICT JUDGE